NEWMAN, Circuit Judge,
dissenting.
Hoffmann-LaRoche’s once-a-month Bo-niva® ibandronate medication for osteoporosis required twelve years of research and clinical testing and evaluation to demonstrate its efficacy when dosed once a month and its safety at this high monthly dosage. The prior investigations of intermittent dosing, and the publications describing protocols of lesser success, missed the protocol that produced this successful method. Indeed, this prior art weighs heavily against obviousness, for despite extensive exploration, this successful protocol was not discovered.
Invalidation of this patent is not supported by clear and convincing evidence. The court’s ruling of obviousness violates the principles of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (all factors must be considered, including commercial success, failure of others, and long-felt need). The court’s reasoning violates the guidance of KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398, 421, 127 S.Ct. 1727,167 L.Ed.2d 705 (2007) (the standard of obvious-to-try requires a limited number of specified alternatives offering a likelihood of success in light of the prior art and common sense), this court instead invoking judicial hindsight to reconstruct the patented subject matter.
Nowhere amid the many studies of bis-phosphonate osteoporosis treatments over a wide range of dosages and conditions, did any reference show or suggest the Boniva® combination of a single 150 mg dose and once-a-month administration. No reference suggested the effectiveness and safety of this combination. Nonetheless, my colleagues declare this treatment obvious to them. My colleagues’ primary reason, that 150 mg is thirty times the daily dose of 5 mg, does not mention that the FDA refused to approve the 5 mg dose due to its toxic side effects. Surely this leads away from the obviousness of a single dose thirty times larger.
I respectfully dissent.
Discussion
The unexpected results of the patented method are conceded by the panel majority. The evidence on summary judgment was that many others sought and failed to find an efficacious intermittent treatment schedule. The prior art relied on by my colleagues surrounded but missed the Roche method. The prior art shows that safety is likely to be compromised at high doses, and that efficacy is likely to be compromised at extended dosing intervals. Nonetheless, this court now holds that it was obvious to do what no one did or even suggested; my colleagues simply disregard the preferences and toxicity warnings and discard the procedures of the prior art.
The prior art shows intermittent therapies ranging from every other day to once a week to twice a week to twice a month to every three months plus varying initial loading periods, in a wide range of dosages. The prior art is replete with warnings of toxicity and patient noncompliance. The panel majority acknowledges that Roche’s MOBILE study and the nonlinear bioavailability data (discussed infra) demonstrate that the 150 mg monthly treatment produced unexpected results, but deems this irrelevant; the court now, with *1336 knowledge of Roche’s success, deems Roche’s successful method to have been obvious all along.
The Supreme Court recognized in KSR that a patent challenger must “identify a reason that would have prompted a person of ordinary skill in the relevant field” to arrive at the patented invention. 550 U.S. at 418, 127 S.Ct. 1727. My colleagues, unable to find any suggestion of the Roche protocol in the prior art, accept the argument that a monthly single dose of 150 mg was obvious because a monthly dose of 150 mg is thirty times a daily dose of 5 mg. The FDA had refused to approve a daily dose of 5 mg due to its demonstrated heightened toxicity. The success of a dose thirty times larger than the prohibited 5 mg dose cannot reasonably be predicted. Neither the prior art, nor common sense, provides the expectation that a once-a-month treatment at a dosage of 150 mg would be safe and effective.
A. The Prior Art

1. The Mockel Patent

My colleagues combine many references to support their ruling of obviousness. They cite the Mockel patent[1] for the proposition that single doses of more than 150 mg were “known.” Mockel is directed to coated tablet formulations, not the concentration of active ingredients. Mockel provides specific examples of ibandronate tablets containing a maximum dose of 50 mg, states that the preferred upper limit is 100 mg, and that the formulations could contain up to about 250 mg. Mockel shows no formulated dose larger than 50 mg, although the reference contains the usual expansive statements of the patent scrivener.
Mockel states that “no significant side effects were observed in clinical studies using ibandronate at high dosages,” but does not state that “high” exceeds his preferred upper limit, for at that time the FDA had determined that “[a] single oral dose of 100 mg is the maximum tolerable dose of ibandronate.” J.A. 8558. Yet my colleagues rely on this reference as rendering obvious Roche’s specific once-a-month dosage of 150 mg.
A Lunar News
Other references also show that the field was seeking a better bisphosphonate protocol, and that the problems were not solved. The Lunar News article,[2] on which the panel majority places heavy reliance, broadly states that some osteoporosis agents can be given intermittently. However it never directly associates iban-dronate with oral therapy. Instead, the Lunar News article states the then-current wisdom that “[t]he projected mode for ibandronate is injection once every three months.” J.A. 24321. Contrary to the panel majority, this article supports unob-viousness of the Roche therapy, not obviousness.

S. The Chen Patent

The Chen patent[3] is similarly inapt. Chen sought to minimize the adverse effects associated with bisphosphonic acids by combining the bisphosphonic acid with a carrier that acts as a dispersing medium for the active agent. Chen lists all of the known bisphosphonic acids, and states that oral dosages may be administered any *1337 where between once every two weeks and once every twelve weeks, with the optimal frequency of once every twelve weeks. Chen does not provide any example using ibandronate, and does not suggest a specific dosage or dosage interval for any iban-dronate-eontaining product. Nor does Chen state what parameters may lead to a successful regimen.

k- The Geddes Patent

The other references on which my colleagues rely are no more helpful to their conclusion. The Geddes patent[4] is directed to a combination therapy of a bisphos-phonate compound and a hormone, and states that the bisphosphonate may be dosed from every day to once a month. Geddes does not mention ibandronate or the dosage or suggest that it may be effective at 150 mg once a month.

5.The Schofield Patent Application

The Schofield application,[5] on which the court also relies, describes a treatment regimen featuring a front-end “loading period” of 7 to 180 days, followed by a maintenance dose. The loading dose of bis-phosphonate may be given daily or every other day, while the maintenance dose may be given anywhere from daily to monthly. Schofield further states that the loading dose is about two to twenty times greater than the maintenance dose. Schofield mentions ibandronate as a possible active agent appropriate for use in its methods, but provides no dosages or specified periods for ibandronate.

6. The Riis Article

Several references address intermittent treatment, but none suggests once-monthly administration of 150 mg of oral iban-dronate. The court relies on the Riis article,[6] which shows dosing patients with 20 mg of ibandronate every other day for twenty-four days, followed by a 9-week period of no treatment, then returning to 20 mg every other day for twenty-four days, and a 9-week period of no treatment, etc. The court characterizes this as definitive proof of the “total dosing concept.” However, Riis makes no suggestion that the once-a-month dosing at the high dosage used by Roche could replace Riis’ elaborate procedure.
Riis illustrates the general belief that some sort of complex dosing is needed if daily doses are supplanted. The simplicity of the Boniva® regimen is nowhere to be found, although the need for a better regimen was well recognized. See Graham, 383 U.S. at 18, 86 S.Ct. 684 (objective evidence of nonobviousness includes long-felt need and failure of others). Riis contains no suggestion that a once-monthly dosage of 150 mg would be both safe and effective — this became known only after Roche discovered it.
7. The Recker Study
By comparison, the Recker article,[7] which sets forth in its introduction the state of the art in 2004, states that “oral bisphosphonates must be administered frequently (e.g., daily or weekly)” and in accordance with “stringent dosing recommendations.”
*1338 Only this court reads the prior art to suggest and render obvious that which eluded the art at the time.

8. The Ravn Study

The court attempts to overcome the shortcomings of the prior art by applying the total dose concept of Riis to the dosage ranges in the Ravn[8] reference. Ravn tested daily treatment using a range of dosages and concluded that 2.5 mg per day is the most effective dose. Yet the court selects Ravn’s 5.0 mg dose, despite its increased toxicity and Ravn’s preference for the lower dose, to scale up to Roche’s 150 mg dose. Ravn does not suggest a once-monthly dose of 150 mg.
It is also noteworthy that the Riis publication, which is later in time than Ravn, selected the 2.5 mg dosage, not the 5.0 mg dosage, as a framework for intermittent dosing.

9. The Daifotis Patent

The panel majority also cites a patent issued to Roche’s expert Dr. Daifotis[9] as evidence of obviousness of monthly oral dosing. Dr. Daifotis described dosing schedules ranging from twice a week to twice a month, and recommended once-a-week dosing of 7 mg to 100 mg, with a preferred range of 35 mg to 50 mg per week. Daifotis does not show or suggest any monthly dosage, or that monthly dosing might be effective. Nonetheless the panel majority selects the Daifotis 35 mg per week dosage, calculates that 35 mg times 4 weeks is about 150 mg per month, and combines this calculation with Riis and Ravn to find obvious the Roche combination of dosage and schedule.
B. The Bioavailability Explanation
My colleagues agree that the results achieved with the Boniva® product were not suggested or predicted. In her expert report Dr. Daifotis discussed the scientific basis that had later been found to explain the successful treatment obtained with this protocol. Dr. Daifotis presented a published scientific article by Reginster[10] et al. showing the disproportionate uptake of ibandronate into the blood stream, an unpredicted and unusual result. Dr. Daifotis testified that this explains the unexpected efficacy of Roche’s 150 mg dose. The record contains the following graphical portrayal, where the mean area under the curve (AUC) indicates the average concentration of ibandronate in the blood:
*1339 [[Image here]]
Dr. Daifotis explained that “[t]his was a surprising finding concerning the disproportionate amount of ibandronate that becomes available from oral administration of amounts above about 50 mg, and it was unknown as of May 2002.” J.A. 20726-27 ¶ 108. Dr. Daifotis explained that “[t]he benefit of this surprising result was that a patient could receive higher than thought possible amounts of active drug to be available to inhibit osteoclasts, while at the time not adversely affecting the safety profile of a 150 mg dose of ibandronate.” J.A. 20732 ¶ 115.
Dr. Daifotis also cited clinical trial data showing that a 150 mg monthly dose of ibandronate is superior at increasing bone density in the lumbar spine of postmenopausal women, as compared to 100 mg given once a month, 50 mg given on two consecutive days in a single month (50/50) and a 2.5 mg daily dose.
The record contains other scientific articles, e.g., Paul D. Miller et al., Monthly Oral Ibandronate Therapy in Postmenopausal Osteoporosis: 1-Year from the Mobile Study, 20 J. Bone Miner. Res. 1315-22 (2005). Nothing in the prior art renders the result expected, predicted, or obvious.
C. Expert Testimony
Also of record were the reports of Roche’s experts Dr. Bilezikian and Dr. Harris. Roche explained that each opines that, at the time of the inventions, a person skilled in the art would not have had any reasonable expectation of succeeding with a safe, effective, and well-tolerated once-monthly oral dosage of ibandronate in an amount as large as 150 mg.
The trier of fact is “requir[ed to] consider all evidence relating to obviousness before finding a patent invalid on those grounds.” In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1075 (Fed.Cir.2012). It is noteworthy that although the generic producers who are defendants herein also presented expert reports, no expert provided anything other than a personal opinion that the Roche discovery was obvious.
*1340 The evidence of long-felt need, failure of others, and commercial success was unre-butted, and no adverse expert provided any evidence from which the success of the Boniva® product could be confidently predicted. Their only argument was that it would have been “obvious to try” the Roche method. Of course, it is possible to speculate about all sorts of treatment schedules, as in the Krause newsletter,[11] but speculation without specificity and a plan for achieving a reasonable likelihood of success does not provide clear and convincing evidence of obviousness on the ground of “obvious to try.”
D. Obvious to Try
For an invention to be obvious to try, there must be a finite number of known choices in the prior art, and a reasonable expectation of success for the choice that is tried. KSR, 550 U.S. at 421, 127 S.Ct. 1727. Obvious to try cannot be found when the prior art gives no hint that a specific trial might achieve the desired result. In re Kubin, 561 F.3d 1351, 1359 (Fed.Cir.2009) (quoting In re O’Farrell, 853 F.2d 894, 903 (Fed.Cir.1988)). Dr. Daifotis testified, “monthly oral dosing of alendronate was not seen as a feasible or desirable endeavor for investigation; if it had been, we would have explored it.” J.A. 20717.
The law of “obvious to try” requires that there be a limited number of defined alternatives and a suggestion that the desired result is likely to be achieved through the proposed trial. The Court stated:
When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.
KSR, 550 U.S. at 421, 127 S.Ct. 1727. Here, however, even my colleagues agree that the result was unpredicted, and that there was no suggestion in the prior art, or in common sense, that this procedure might produce the sought-after result. Nonetheless, my colleagues invalidate the successful treatment as “obvious to try.”
The extensive experimentation with other regimens and dosages demonstrates that this selection was not obvious to try. The failure to meet this long-felt need weighs heavily against my colleagues’ finding that the Roche protocol, although not obvious to investigators in the field, is obvious to this court. As stated in In re Soni 54 F.3d 746, 750 (Fed.Cir.1995), “[t]he basic principle behind this rule is straightforward — that which would have been surprising to a person of ordinary skill in the particular art would not have been obvious.” As established in KSR, absent limited alternatives and some direction toward the successful path, “obvious to try” is not applicable.
The prior art does not suggest the Roche protocol, or that it might have a reasonable expectation of success. Only with knowledge of Roche’s success, can one reconstruct that which is not suggested in the prior art. If anything, the large amount of study and publication adds to the uncertainty, for it provides no direction for potential success. The court’s holding today will simply discourage improvements in crowded fields, by holding that even if such investigation should succeed, a patent is not available.
*1341 From my colleagues’ invalidation of the patent on this significant medical advance, I respectfully dissent.

. U.S. Patent No. 6,143,326 (filed Apr. 1, 1997).

. Update: Bisphosphonates, Lunar News, Spring, 27-29 (1999).

. U.S. Patent No. 6,468,559 (filed Apr. 28, 2000).

. U.S. Patent No. 5,616,560 (filed Mar. 20, 1996).

. U.S. Patent Application Pub. No.2003/0118634 (filed Dec. 17, 2002).

. BJ Riis et al., Ibandronate: A Comparison of Oral Daily Dosing Versus Intermittent Dosing in Postmenopausal Osteoporosis, 16 J. Bone Min. Res., 10, 1871-78 (1997).

. R. Recker et al., Insufficiently Dosed Intravenous Ibandronate Injections are Associated with Suboptimal Antifracture Efficacy in Postmenopausal Osteoporosis, 34 Bone 890 (2004).

. P. Ravn et al., The Effect of Bone Mass and Bone Markers of Different Doses of Ibandro-nate: A New Bisphosphonate for Prevention and Treatment of Postmenopausal Osteoporosis: A 1-Year Randomized, Double-Blind, Placebo-Controlled Dose-Finding Study, 15 Bone 527-33 (1996).

. U.S. Patent No. 6,432,932 (hied Sep. 2, 1999).

. Jean-Yves Reginster et al., Monthly Oral Ibandronate is Well-Tolerated and Efficacious in Postmenopausal Women: Results From the Monthly Oral Pilot Study, 90 J. of Clin. Endoc-rin. & Metab. 5018-24 (2005).

. Carey Krause, Roche, GlaxoSmithKline in Drug Pact, Chem. Market Reporter, December 17, 2001.