O’MALLEY, Circuit Judge,
concurring in the denial of the petition for rehearing en banc.
I concur in the court’s denial of the petition for rehearing en banc. I write to assuage Bristol-Myers Squibb Co.’s (“BMS”) and the amici’s[1] fears that this panel decision has rewritten the test for obviousness for pharmaceutical patents. In my view, the concerns expressed are unjustified and mischaracterize the opinion. This case does not forge new ground or set down immutable principles. It simply decides that, on the record before it, the district court did not err in finding the asserted claim of the '244 Patent invalid as obvious.
As the panel opinion explains, an invention is unpatentable when “the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.” 35 U.S.C. § 103(a) (2006).[2] Obviousness is a question of law based on the following underlying factual findings: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claims and the prior art; and (4) objective indicia of non-obviousness, such .as commercial success, long-felt but unmet needs, failure of others, and unexpected results. KSR Int’l *1342 Co. v. Teleflex, Inc., 550 U.S. 398, 406, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007); Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).
In this case, the panel affirmed the district court’s conclusion that entecavir, BMS’s antiviral compound used to treat hepatitis B, was invalid as obvious.[3] The panel found the record supported the selection of 2'-CDG as a lead compound and the conclusion that one of ordinary skill in the art would have been motivated to modify 2'-CDG in such a way to arrive at the patented compound, entecavir. Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc., 752 F.3d 967, 975 (Fed.Cir.2014). The panel then agreed with the district court that, despite some evidence of objective indicia demonstrating non-obviousness, the totality of the evidence supported the conclusion that entecavir was obvious. Id. at 979.
In the petition for rehearing en banc and the supporting amicus briefs, BMS and the amici claim that, in reaching its judgment, the panel dramatically altered the jurisprudential landscape governing obviousness claims in pharmaceutical cases. And they predict that dire consequences will flow therefrom. They express concern about (1) the panel’s treatment of post-invention evidence regarding the differences between the prior art and the invention, specifically when determining if a skilled artisan would have been motivated to make the claimed compound with a reasonable expectation of success for its therapeutic use; (2) the panel’s description of what constitutes an unexpected result in the pharmaceutical context; (3) the party upon whom it placed the burden of proof at certain stages of its obviousness inquiry; and (4) the way in which the panel weighed the evidence of objective indicia of non-obviousness.
BMS and the amici first contend that the panel improperly limits consideration of evidence regarding the properties of the invention and the prior art to those known at the time of the invention. Specifically, BMS and the amici argue the panel forecloses the possibility of reviewing later-discovered differences between the prior art and the claimed invention by requiring these differences to be unexpected “by one of ordinary skill in the art at the time of the invention.” Id. at 977 (emphasis added). BMS and the amici allege that the panel erred by not considering later-discovered unexpected results, and now closes the door to all reference to such evidence. I disagree.
Our case law clearly allows the consideration of later-discovered differences between the prior art and the invention. See Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm., Inc., 748 F.3d 1354, 1360 (Fed.Cir.2014) (“Glenmark also argues that later-discovered benefits cannot be considered in an obviousness analysis.... That is incorrect; patentability may consider all of the characteristics possessed by the claimed invention, whenever those characteristics become manifest.”); Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc., 655 F.3d 1291, 1307 (Fed.Cir.2011) (“[EJvidence of unexpected results may be [considered] ... even if that evidence was obtained after the patent’s filing or issue date.”); Knoll Pharm. Co. v. Teva Pharm. USA, Inc., 367 F.3d 1381, 1385 (Fed.Cir.2004) (“Evidence developed after the patent grant is not excluded from consideration, for understanding of the full range of an invention is not *1343 always achieved at the time of filing the patent application.”). These differences inform the obviousness analysis and thus can be considered when assessing what was understood by one of skill in the art at the time of the invention and what expectations may have been reasonable.
Like all evidence of objective indicia, the point of considering later-understood evidence regarding the properties of the invention is to guard against hindsight bias by assessing claims of a motivation to combine as of the time of invention in light of later surprises or developments. KSR Int’l Co., 550 U.S. at 421, 127 S.Ct. 1727; see Graham, 383 U.S. at 36, 86 S.Ct. 684; cf. Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697-98, 53 S.Ct. 736, 77 L.Ed. 1449 (1933) (“The law will make the best appraisal that it can, summoning to its services whatever aids it can command [to assess a claimed knowledge base or expectation].... [I]f years have gone by before the evidence is offered[,] [later acquired experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages and forbids us to look within.”). The panel opinion could not rewrite this precedent even if it wanted to; in this case, I see no evidence it sought to do so.
The line of the opinion to which BMS and the amici refer simply notes that the inquiry into what one of skill in the art understood and reasonably expected must be fixed as of the time of the invention. It does not say only properties of the invention known at the time of the invention can be considered for purposes of informing that inquiry. Indeed, as we have said repeatedly over the years, post-issuance evidence regarding objective indicia of non-obviousness may often be the most probative and cogent evidence in the record. Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed.Cir.1983). This is especially true where the post-issuance evidence relates to unexpected results. See Sanofi-Aventis, 748 F.3d at 1360.
Apparently recognizing that the panel opinion does not expressly purport to change the law, BMS and the amici argue that, by adopting the district court’s finding that 2'-CDG was considered safe and non-toxic at the time of the invention, despite evidence that it was later determined to be toxic, the panel implicitly condoned the exclusion of evidence regarding later-discovered properties, in this and future cases. There is a distinction between limiting the obviousness inquiry to pre-invention evidence and finding post-invention evidence unpersuasive, however. See Allergan Inc. v. Sandoz Inc., 726 F.3d 1286, 1293 (Fed.Cir.2013) (“We agree with the court’s finding that this result was unexpected. However, we do not find that these unexpected results are sufficient to outweigh the other evidence of obviousness.”).
What the district court found was that the later evidence of 2'-CDG’s toxicity was insufficient to overcome the strong evidence that researchers at the time had a motivation to start with 2'-CDG as the lead compound and modify it in such a way as to make entecavir. The court then cited a host of evidence in the record to support that conclusion. BMS and the amici say that the trial court’s conclusion cannot have been correct because 2'-CDG was later shown to be toxic. They argue that no medicinal chemist could have had a reasonable expectation of success from use of 2'-CDG as a lead compound because they could not have known if any modification to it would be safe for human use.
As the district court pointed out, BMS did not question the reasonableness of a skilled artisan’s expectation on these *1344 grounds until its reply brief before the trial court and, thus, arguably waived that argument. Bristol-Myers Squibb Co., 923 F.Supp.2d at 674 n. 36. And, the district court rejected the merits of BMS’s argument, finding that the level of 2'-CDG’s cytotoxicity was not known at the time of the invention and that tentative concerns about the toxicity did not stop researchers from using 2'-CDG as a starting point. As the district court said, “the best indication that any such tentative references to possible toxicity did not stop the medicinal chemist from sélecting 2'-CDG as a lead compound in the late 1980s and 1990, in light of its positive benefits, is the fact that researchers were actually treating and using 2'-CDG as a lead compound during the relevant time period.” Id. at 662. Indeed, BMS’s own expert, Dr. Bud Ten-nant, testified that, during his experiments investigating the effects of 2'-CDG against the woodchuck hepatitis virus—which occurred after enteeavir’s invention—he was surprised to find 2'-CDG was toxic. Id. at 623-24.
While the later findings regarding 2'-CDG’s toxicity certainly make claims regarding the reasonableness of any expectation of success less credible, on this record, the panel did not act beyond the pale in concluding that the district court’s factual conclusion regarding the existence of a reasonable expectation of success was not clearly erroneous.[4] The panel’s decision to affirm the district court’s findings does not foreclose the possibility that post-invention evidence regarding the properties of either the invention or the prior art might be persuasive in the appropriate case. BMS simply did not make a record which would support the conclusion that they were in this case.
BMS and the amici next contend that the panel inappropriately discounted the significance of unexpected results when the panel parsed unexpected results into “differences in kind” and “differences in degree.” They argue that the panel’s treatment of entecavir’s unexpected properties as mere differences in degree from 2'-CDG’s properties diminishes the potentially meaningful distinctions between two compounds by reducing the nuanced unexpected results inquiry to a question of degree versus kind. According to BMS and the amici, this characterization of what may be considered unexpected results creates impossible hurdles for the pharmaceutical industry to overcome, where slight differences between compounds can translate into life or death for a patient.
In its discussion of unexpected results, the panel explained that “[w]hen assessing unexpected properties ... we must evaluate the significance and ‘kind’ of expected results along with the unexpected results.” Bristol-Myers Squibb Co., 752 F.3d at 977. This statement is consistent with our precedent that one should consider the sub-stantiality of the differences between' the properties of the prior art and those of the invention to determine the significance of those differences. See In re Soni, 54 F.3d 746, 751 (Fed.Cir.1995) (“Mere improvement in properties does not always suffice to show unexpected results.... [W]hen an applicant demonstrates substantially improved results ... and states that the results were unexpected, this should suffice to establish unexpected results in the absence of evidence to the contrary.”); In re *1345 Chupp, 816 F.2d 643, 646 (Fed.Cir.1987) (“[T]he mere submission of some evidence that a new compound possesses some unpredictable properties does not require an automatic conclusion of nonobviousness in every case.”); In re Merck, 800 F.2d 1091, 1099 (Fed.Cir.1986) (“In the absence of evidence to show that the properties of the compounds differed in such an appreciable degree that the difference was really unexpected, we do not think that the Board erred in its determination.”); In re Corkill, 771 F.2d 1496, 1501 (Fed.Cir.1985) (“A greater than expected result is an eviden-tiary factor pertinent to the legal conclusion of [ ] obviousness.”).
While reading the panel’s statement that a “ ‘mere difference in degree’ is insufficient” to render a compound patentable out of context admittedly could lead to some confusion, the panel’s entire discussion of unexpected results makes clear that one must consider the extent of the differences between properties of the prior art and the invention to determine the weight such evidence should be given in the obviousness analysis. The reference to differences in kind versus differences in degree was merely illustrative of how one can assess unexpected properties—it was not essential to the panel’s finding that it would defer to the district court’s factual finding that the results upon which BMS relied were not truly unexpected or substantial. Bristol-Myers Squibb Co., 752 F.3d at 978. Accordingly, I do not believe the panel’s mere use of the phrasing to which BMS objects inappropriately reduces the question of unexpected results to a purely mechanical application of degree versus kind.
BMS and the amici next contend that the panel endorsed the use of a burden-shifting framework, wherein the burden shifted to the patentee once the alleged infringer established a prima facie case of obviousness. The panel neither used nor endorsed a burden-shifting analysis, however; it said explicitly that it was employing a holistic approach to obviousness. Id. at 976-77 (considering Teva’s strong evidence of obviousness alongside BMS’s arguments relating to secondary considerations of nonobviousness); id. at 977 (explaining that “[secondary considerations of nonobviousness ‘must always when present be considered’ ” (quoting In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1075-76, 1079 (Fed.Cir.2012))).[5] Again, the amici and BMS see ghosts that are simply not there.
Lastly, BMS and the amici argue that the panel decision supports comparing the objective indicia of nonobviousness against one another, allowing some to offset others. As the panel itself stated, “[it] understood] the district court to be noting that some categories of [objective indicia] evidence simply were not as helpful to BMS’s case as others. [The panel did] not read the opinion as suggesting that unhelpful evidence somehow diminished the strength of the more persuasive forms of evidence.” Id. at 979. Here, BMS and the amici simply mischaracterize the panel opinion.
Ultimately, a case is won or lost on the record. At the district court, BMS’s own expert, Dr. Schneller, conceded that 2'-CDG would have been considered as a lead *1346 compound by one skilled in the art and acknowledged that 2'-CDG was actually being used as a lead compound at the time of entecavir’s invention. Bristol-Myers Squibb Co., 923 F.Supp.2d at 663 (“BMS’s expert, Dr. Sehneller, ... repeatedly testified at trial that [SRI and Glaxo] chemists were, in fact, treating and using 2'-CDG as a lead compound” during the time of the invention.); id. at 664 (“[T]he testimony of [BMS’s] own expert at trial repeatedly and conclusively established that researchers were, in fact, treating and using 2-CDG as a lead compound in the relevant time period.”). Additionally, Dr. Sehneller admitted that a skilled artisan could have been led to modify 2'-CDG in such a way to arrive at the claimed invention. Id. at 665 (“Dr. Sehneller ... agreed that when a lead compound is selected, a chemist would seek to make conservative changes to that structure.”); id. at 670-71 (Dr. Sehneller stated in his expert report and on cross examination that in light of the prior art a skilled artisan could have been led to substitute an exocyclic methylene group at the 5 prime position of 2'-CDG). In light of these admissions, the district court concluded that, in “almost every significant portion of [its] case, Teva’s position was not only bolstered by the opinion of its expert, Dr. Heathcock, but also by the testimony of BMS’s expert, Dr. Sehneller.” Id. at 686.
Despite the testimony of its own expert below, on appeal, BMS originally focused on the district court’s alleged error in concluding that a skilled artisan would have selected 2'-CDG as a lead compound and modified it to arrive at the claimed invention. Reference to evidence of entecavir’s unexpected properties was raised almost as an afterthought in BMS’s opening brief, as was its focus on the reasonable expectation of success prong of the motivation to combine inquiry before the district court. Now, BMS and the amici adopt a “sky is falling” approach to what is simply a fact dependent opinion. The opinion makes no dramatic changes to the law, closes no doors on what evidence may be considered in undertaking an obviousness inquiry, establishes no hard and fast tests for what results might be considered unexpected in a case involving a pharmaceutical compound, and does not improperly shift the burden of proof or denigrate the importance of objective indicia of non-obviousness.[6] On this record and upon a fair reading of the panel opinion, I do not believe en banc consideration is warranted.

. Merck Sharp & Dohme Corp., Intellectual Property Owners Association, Pharmaceutical Research and Manufacturers of America, Eli Lilly & Co., Pfizer Inc., Biotechnology Industry Organization, and Bay Area Bioscience Association (collectively, "the amici”).

. Because this invention was filed before the adoption of the America Invents Act, the prior version of § 103 governs.

. Specifically, the district court found that claim 8 of U.S. Patent No. 5,206,244 was invalid as obvious. See Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc., 923 F.Supp.2d 602, 686 (D.Del.2013).

. While I agree with all of the concerns thoughtfully expressed by Judge Taranto, as he acknowledges, the current record does not permit us to reach those concerns. BMS did not argue that there was insufficient evidence to indicate that a modification of 2'-CDG would be therapeutically effective, and there is no evidence in the record that skilled artisans at the time doubted that it would be.

. Indeed, the district court made clear that it too understood the importance of objective considerations in the obviousness inquiry. Bristol-Myers Squibb Co., 923 F.Supp.2d at 675 (noting that objective evidence of nonob-viousness must be "considered collectively" with evidence of obviousness, may not be "after-the-fact considerations" and may not be "relegated to ‘secondary status’ ”) (citing In re Cyclobenzaprine Hydrochloride, 676 F.3d at 1078). It just disagreed with the weight BMS asked that they be given in this case.

. I do not discount the fact that, in dissent from this denial of en banc, Judges Newman, Lourie, and Reyna are concerned that the panel opinion did go too far and that Judge Taranto at least believes the opinion can be read — fairly or not — as having done so. We all agree on the law, ‘ we simply disagree whether this opinion is sufficiently at odds with it to warrant en banc consideration.